NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

BRITTANY M., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.R., K.R., D.J., A.J., A.J., *Appellees*.

No. 1 CA-JV 21-0367
FILED 9-13-2022

---

Appeal from the Superior Court in Maricopa County
Nos.  JD 39041
JS 20449
The Honorable Julie Ann Mata, Judge

**AFFIRMED**

---

COUNSEL

David W. Bell, Attorney at Law, Mesa
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge James B. Morse Jr. joined.

---

**B R O W N**, Judge:

¶1        Brittany M. ("Mother") appeals the juvenile court's order terminating Mother's parental rights to her five children. For the following reasons, we affirm.

## BACKGROUND

¶2        Mother is the biological parent of A.R. (born in 2015), K.R. (born in 2017), D.J. (born in 2018), and twins A.J. and A.C.J. (born in November 2019). Roy R. is the biological father of A.R. and K.R. Dontae J. ("Father") is the biological father of D.J., and the alleged father of the twins. Neither Roy R. nor Father are parties to this appeal.

¶3        On February 6, 2020, A.C.J. was admitted to the pediatric intensive care unit ("PICU"). She had several rib fractures in the healing stage, a laceration to her liver, subdural hemorrhage, and severe dehydration. A.J. was admitted to the PICU the next day with similar injuries and a skull fracture. A hospital physician believed the twins were severely malnourished because their weight was in the 1st percentile for their age group. Also, a medical examination of D.J. revealed that he had several rib injuries and a scar on his face.

¶4        Mother had been in California for several days before the twins' admission to the PICU. She said she arrived home early in the evening of February 3 but did not see the twins until the next morning. Although she noticed that A.C.J. seemed ill, she did not seek medical care until February 6, in part because she could not yet qualify for health insurance through the Arizona Health Care Cost Containment System because she had not lived in Arizona long enough.

¶5        The doctor who examined the twins and D.J. suspected the children suffered from inflicted trauma or abuse and reported the family to the Department of Child Safety ("DCS") and law enforcement. Soon thereafter, Father was arrested and charged with six counts of felony child

abuse. DCS took the children into temporary custody on February 7, 2020. All the children were placed in foster care.

¶6        DCS petitioned for dependency, alleging the children were dependent due to Mother's abuse, including failure to protect from abuse, and neglect. DCS then promptly petitioned to terminate Mother's parental rights, alleging she willfully abused or failed to protect her children. Several months later, DCS filed an amended petition, alleging that Mother neglected the children. The court approved the case plan of severance and adoption.

¶7        Due to the severity of the children's injuries, at the outset of the dependency DCS moved to suspend visitation, and the juvenile court granted the request. Mother filed a motion for reconsideration and requested supervised visitation. The court granted the motion, and starting in April 2020, the court allowed Mother to have virtual visitation with the children and by September she resumed in-person visitation with the three older children. Mother's contact with the twins was limited to virtual contact because they were "medically fragile" and due to ongoing concerns that they could be adversely affected by the COVID-19 pandemic. As a result of the February incident, A.C.J. underwent several surgeries to address the liquid in her brain and brain swelling, and to insert a feeding tube. She was also diagnosed as blind. A.J. received physical therapy, occupational therapy, and feeding therapy, and her doctors expressed concern that she had a developmental delay as well.

¶8        After in-person visits resumed with the three older children, they exhibited aggressive behaviors, including biting and self-harm. DCS again moved to suspend visitation, asserting, among other things, that continued visitation would endanger the children's well-being. DCS relied in part on a unit psychologist's report and the children's trauma therapist's recommendation stating their concerns about visitation. The court granted the motion in October 2020, and Mother unsuccessfully sought reconsideration of the court's decision in July 2021.

¶9        A combined dependency and termination hearing took place over five days between May and November 2021. The juvenile court heard testimony from two DCS case managers, the doctor who examined the twins and D.J. at the hospital, a Phoenix police detective, Mother's counselor, Mother's psychologist, and Mother. The court found that DCS proved both termination grounds and determined it was in the children's best interests to terminate Mother's parental rights. Mother appealed and we have jurisdiction under A.R.S. § 8-235(A).

**DISCUSSION**

**¶10**      Before the juvenile court can terminate parental rights, DCS must prove (1) by clear and convincing evidence at least one statutory ground in A.R.S. § 8-533 and (2) by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286, ¶ 15 (App. 2016). "We review the court's termination decision for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579, ¶ 10 (2021). The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

**¶11**      Once the court finds that DCS met its burden of proof, it must "make specific findings of fact in support of termination of parental rights." Ariz. R.P. Juv. Ct. Rule 353(h)(1)(A). At least one finding is required to support each conclusion of law in the court's termination order. *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 240, ¶ 22 (App. 2012). The primary purpose for this requirement "is to allow the appellate court to determine exactly which issues were decided and whether the lower court correctly applied the law." *Id.* ¶ 24. As such, "findings of fact and conclusions of law should be sufficiently specific to enable the appellate court to provide effective review," and "must include all of the ultimate facts—that is, those necessary to resolve the disputed issues." *Id.* at 241, ¶ 25 (quotation and citation omitted). Although minimally compliant with the requirement to make specific findings, the juvenile court's order in this case does not include credibility determinations, resolutions of conflicting evidence, or findings that show what evidence the court found sufficiently compelling to satisfy the clear and convincing standard of proof for either termination ground. The better practice is to include such matters to properly inform the parties of the court's reasoning and ensure effective appellate review.

### A.      Reasonable Efforts

**¶12**      Mother argues that DCS did not meet its burden to provide her with the time and the opportunity to engage in reunification services. The duty to make a reasonable effort to provide reunification services may be statutory, *see* A.R.S. § 8-533(B)(8), (D), or constitutional, *see Jessie D.*, 251 Ariz. at 581, ¶ 18 (recognizing a constitutional obligation to provide reunification services to incarcerated parents). The grounds for termination outlined in § 8-533(B)(2), however, contain no express language requiring DCS to make reasonable efforts to provide reunification services before

termination. And to our knowledge, no Arizona appellate court has held that DCS is required to provide reunification services when termination is sought for abuse or neglect grounds. *Cf. Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 510, ¶ 11 (App. 2008) (recognizing that "neither § 8-533 nor federal law requires that a parent be provided reunification services before the court may terminate the parent's rights on the ground of abandonment"). Even assuming Mother was entitled to reunification services under § 8-533(B)(2), the record shows DCS met its burden here.

¶13 DCS must provide services and allow the parent opportunity to engage before requesting termination of a parent's rights. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz., 185, 192, ¶ 37 (App. 1999). DCS is not required, however, to wait indefinitely for a parent to engage in services, nor is it required to provide services if doing so would be futile. *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 15 (App. 2011); *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994).

¶14 An exception to the duty to provide services exists if "the court finds by clear and convincing evidence" that aggravating circumstances are present. A.R.S. § 8-846(D)(1). As relevant here, DCS alleged the following aggravating circumstances under § 8-846(D)(1)(d): that Mother "knew or reasonably should have known that another person committed an act that constitutes a dangerous crime against children as defined in A.R.S. § 13-705 or caused a child to suffer serious physical injury or emotional injury." The juvenile court, however, did not explicitly find that aggravating circumstances existed to relieve DCS from its duty to provide services to Mother. Regardless, reasonable evidence shows that DCS made diligent efforts to provide reunification services.

¶15 DCS offered various services to Mother, including a parent-aide referral, facilitated visitation, drug testing, substance abuse assessment and treatment, case management, psychological evaluation, and counseling. Despite DCS's referral for a parent aide, Mother did not "recognize her failure to protect the children from physical abuse" and failed to improve her "caregiver protective capacities." Mother resumed in-person supervised visits with the three older children in September 2020. During these visits, the parent aide was concerned that Mother was not able to manage the children. For example, the parent aide reported that Mother failed to redirect the children when they became upset during the visit. When D.J. left the room during the visit, Mother did not follow him, and the parent aide had to get him and explain to Mother that it was not safe for D.J. to be outside alone. Mother also asked to end one visit early when K.R. told her he was mad.

**¶16**        The evidence also shows that the three older children experienced aggressive behaviors after in-person visits resumed. For instance, K.R. became "extremely violent, bit[] teachers . . . and peers, attempt[ed] to run out of a building, and [had] wetting accidents on day of visits." The trauma therapist explained that K.R.'s behaviors "appear to have increased around the time in person visits started" and "appear to be trauma responses." D.J. also exhibited "regressive behaviors that had significantly reduced previously," including biting his peers, hitting his brother, and "being clingy and violent during his outbursts." The record also shows that A.R. was more argumentative at home, lied, and was mean to her brother following in-person visits. Visits were suspended a second time in October 2020.

**¶17**        Mother argues that DCS should have provided her with modified visitation services. She contends that although she wanted visitation with the children, it took several months to implement the service. We recognize that visitation "is perhaps the most basic and essential" service because visitation allows the parent "to show that the child is no longer dependent" and could properly be returned to the parent's care. *Michael M. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 198, 200, ¶ 9 (App. 2002). Visitation may be restricted or suspended only if it "endangers the child." *Id.* at 201, ¶ 11.

**¶18**        The juvenile court initially suspended visitation due to the severity of the children's injuries, but Mother was permitted to engage in virtual visits with all children as soon as April 1, 2020, less than a month after the court suspended visitation. By September 2020, Mother was able to participate in in-person visitation with the three older children, but this was later suspended in October 2020 at the recommendation of the children's trauma therapist and a unit psychologist, due to the older children's aggressive and regressive behaviors. Mother did not have in-person visits after October 2020, and the record is unclear as to whether Mother had virtual visits with the three older children.

**¶19**        Although the juvenile court stated that Mother's virtual visits with the twins were suspended, nothing in the record shows that Mother's virtual visits with the twins were suspended at any point during the proceedings. According to a DCS report to the juvenile court dated April 21, 2021, Mother received two hours of virtual visits with the twins each week and had attended "all of her visitations with the children." Mother testified that her last virtual visit with the twins was in April 2021, but she has not identified any evidence in the record showing why no visits with the twins occurred between that date and when the termination hearing

was completed in November. On this record, Mother has shown no abuse of discretion.

**¶20** Mother also asserts she was not invited to participate in earlier child and family team ("CFT") meetings. But Mother does not allege the specific dates for the CFT meetings to which she was not invited. Both a DCS caseworker and Mother testified that she did attend CFT meetings. Mother explained that some meetings conflicted with her work schedule. And although the most recent email for the latest CFT meeting may have contained the wrong date or time, Mother testified that she received "the wrong date and time to call in" because her time settings were incorrect and were "off by about an hour."

**¶21** Mother also challenges DCS's reports as inaccurate and unfair, and argues that DCS did not act in good faith in providing services. She contends that when her counselor requested a team meeting to address Mother's concerns, "she was ignored." Mother, however, does not provide record support for these contentions. Nor has she explained what was inaccurate about the reports. As far as the record reveals, Mother did not object to admitting the DCS reports at trial. Thus, reasonable evidence supports the court's finding that DCS made reasonable efforts to reunify Mother with her children. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (viewing the evidence and reasonable inferences therefrom "in the light most favorable to sustaining the court's decision").

### B. Abuse or Neglect

**¶22** To meet its burden, DCS was required to prove that Mother abused or neglected the children. Abuse is defined as "serious physical or emotional injury or situations in which the parent knew or *reasonably should have known* that a person was abusing or neglecting a child." (Emphasis added). A.R.S. § 8-533(B)(2). Neglect is defined as "[t]he inability or unwillingness of a parent . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a); *see also E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 59, ¶ 13 (App. 2015). A finding of abuse or neglect is not required for each child in a proceeding. *See Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 227, ¶ 13 (2020). However, "to terminate parental rights to children who exhibit no evidence of neglect or abuse," the court must find "by clear and convincing evidence, that there is a risk of harm to those children." *Id*. at 228, ¶ 17.

¶23 Mother argues the juvenile court erred when it concluded that Mother knew or reasonably should have known that Father was physically abusing the children. She contends that while it was true that three of her children were abused, she was unable to identify the threat of that abuse and prevent it from occurring because she was not in Arizona when the abuse occurred.

¶24 The children's injuries and abnormal health conditions were described as "chronic," meaning they likely occurred before Mother's trip to California. The doctor who examined the children testified that A.C.J. was "critically ill"—she was extremely dehydrated and malnourished, and suffered from an abdominal injury and injury to her head and ribs. The doctor explained that A.C.J.'s head CT scan showed chronic blood in the brain, meaning the blood was likely more than a week old. She also testified that A.J. and D.J. both had rib injuries that were in various stages of healing. She explained that rib fractures do not show evidence of healing until "seven to ten days out at the earliest" and that she believed the rib fractures were "older than five days." The evidence supports the juvenile court's finding that "[b]ased on the chronic and acute nature of the injuries, [DCS] has proven that Mother failed to identify threats, and failed to protect the children from physical abuse."

¶25 Mother argues there was insufficient evidence for the juvenile court to conclude that she was aware that Father was abusing the children. She contends the court discredited her testimony and the testimony of a Phoenix police detective, psychologist, and Mother's counselor. Contrary to Mother's assertion, the court did not find that she was aware of the abuse. Instead, the court found that Mother failed to identify threats and protect the children from abuse. The examining doctor testified that although Mother might not have known of the children's precise injuries, she should have recognized that they were showing symptoms or that something was wrong. The doctor expressed concern that the children were not brought in sooner, given that they were in "critically ill condition," and that "it was obvious that [A.C.J.] was quite ill." Mother essentially asks us to reweigh the evidence, which we will not do. *See Jesus M.*, 203 Ariz. at 282, ¶ 12 (noting that the "resolution of . . . conflicts in the evidence is uniquely the province of the [superior] court.").

¶26 Mother also contends the juvenile court erred by finding that she neglected the children. Mother admits that, in hindsight, she should have taken A.C.J. to the hospital sooner, but contends that her delay was "understandable" because she had no income or insurance. She contends that she did not know the twins were injured, and thus did not realize that

"a few days of difficulty with feeding would become an emergency."  But the court's ultimate conclusion that Mother neglected the children was not solely based on Mother's delay in taking A.C.J. to the hospital.  The court found that Mother could not explain why the children had fractures in various stages of healing, or what caused A.C.J and A.J. to be severely dehydrated and malnourished.  These findings are supported by the record and the juvenile court did not err in finding that Mother neglected the children.

¶27        Mother also argues the court operated from an erroneous timeline of events in finding that she waited several days before seeking medical care for A.C.J.  But the court did not make a finding about how long Mother waited before seeking medical care for A.C.J., nor were the court's conclusions that DCS met its burden for both grounds of termination solely based on this timeline.

**CONCLUSION**

¶28        We affirm the juvenile court's order terminating Mother's parental rights.

